MUNICIPALITY OF PONCE, Plaintiff and Appellee, *v.* ALBERTO VIDAL VILARET ET UX., Defendants and Appellants.

No. 9018. Argued April 6, 1945.—Decided November 15, 1945.

*Gustavo Rodríguez* and *R. V. Pérez Marchand* for appellants. *F. M. Susoni, Jr.*, for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

On February 11, 1925, Alberto Vidal and his wife executed a contract with the Municipality of Ponce by virtue of which the former constituted in favor of the latter a perpetual servitude for the laying of aqueduct pipes on a strip of land which crosses four properties belonging to them. The servitude also includes a right of way in favor of the municipality over the four properties, 4 meters in width, alongside the pipes in order to facilitate its construction, preservation, and inspection, it being incumbent on the municipality to place alongside said pipes, gates and locks with two keys, the owners of the property having the right to use the area of the land over said pipes but without causing any damage to the main pipe line.

In consideration of this servitude, the municipality granted them the right of taking *ad perpetuam* 18,000 gallons of water each 24 hours distributed proportionately among the four properties affected by the servitude, under the following conditions: (1) The municipality shall pay the cost of the water pipe connection and installation of the meter. (2) The owner of the property shall use the concession of water for domestic purposes, to water cattle, and for cleaning the stables, it being understood that the owners of the property affected by the servitude shall be entitled to take a greater amount of water per day for the said purposes, paying, of course, the excess of water taken, according to the rate in force. (3) "The Municipality of Ponce binds itself to sell at public auction, according to law, the land occupied by the water pipe connection, once it is decided that the service of aqueduct is no longer needed."

On April 3, 1941, the Municipality of Ponce brought this action for rescission of contract and as a cause of action, in addition to the facts already set forth, it substantially al-

348

leged: That the defendants, in violation of the aforesaid contract of servitude and for the purpose of getting a greater amount of water than that auhorized under the contract, connected to the main pipe line 4 pipe connections described in the complaint; that by using pumps and a motor-operated windmill they have been taking 624,000 gallons[1] of water each 24 hours in excess of the 18,000 gallons granted under the contract; that said excess has been used for irrigation in violation of the stipulations of the contract and wihout paying therefor to the plaintiff any amount whatever; and that by the unlawful use of said waters the defendants have vitally affected the capacity of the aqueduct, depriving the community of the water needed for domestic purposes and constituting a menace to public health. The complaint closes by praying for judgment with the following proouncements:

"(a) To declare rescinded and to rescind the contract executed by virtue of deed No. 5 of February 11, 1925, before Notary Domingo Sepúlveda, as to clauses b, c, d, and e;[2]

"(b) To order the disconnection and closing of every water pipe

---

[1] The complaint alleged that the defendants used 12,000 gallons of water in excess each 24 hours, but at the trial this allegation was amended by raising said amount to 624,000 gallons for each 24 hours.

[2] Clauses b, c, d, and c, as they appear in the contract of servitude, read as follows: (P. 20, Tr. of Ev.)

"b. The Municipality of Ponce grants to Doña Josefa Santiago de Vidal and her husband Don Alberto Vidal, the right to take ad perpetuam 18,000 gallons of water each 24 hours, distributed proportionately among the four properties affected by the servitude. The Municipality shall pay the cost of the water pipe connection and the installation of the meter.

"It is agreed that in an emergency case the contracting parties will be given same opportunity as the city of Ponce, in proportion to their interest, respectively.

"(c) It is understood that the owner of the property shall use the concessions of water for domestic purposes, to water cattle, and for cleaning the stables.

"(d) It is agreed that the owner of the property affected by this servitude shall have the right to take a greater amount of water per day for the same purpose, paying, of course, the excess of water, according to the rate in force.

"(e) It is agreed that the Municipality of Ponce binds itself to sell at public auction according to law, the area of land over the water pipe connection once it is decided that it is no longer needed for the aqueduct service."

connected to the main pipe line alongside said pipe which crosses defendants' property, subject to the contract of servitude;

"(c) To adjudge the defendants to pay, *in solidum* and severally, the costs, expenses, and attorney's fees.

The defendants demurred to the complaint for insufficiency and because there existed another action pending before the same court for the same cause; and that in the event that the complaint should be held sufficient, it appeared from the face thereof that the action had prescribed. The demurrers having been dismissed, defendants reproduced in their answer the objection for insufficiency of facts to constitute a cause of action and then for the first time set up the demurrer for misjoinder of parties.

Passing on the merits of the case, the lower court rendered judgment annulling the contract in question on the ground that in its opinion it was contrary to public policy, and adjudged the defendants to pay $2,000 as attorney's fees and costs.

The defendants-appellants maintain that the court erred in overruling its demurrer for insufficiency of facts to state a cause of action.

■ The action for rescission is regulated by § 1243 of the Civil Code and only the contracts specified in said Section may be rescinded, the said Section reading as follows:

"Section 1243. The following may be rescinded:

"1. The contracts which may be executed by guardians without the authorization of the competent district court, provided the persons they represent have suffered lesion of more than one-fourth part of the value of the things which may have been the object thereof.

"2. Those executed in representation of absentees, provided the latter have suffered the lesion referred to in the preceding number.

"3. Those executed in fraud of creditors, when the latter can not recover, in any other manner, what is due them.

"4. Contracts relating to things in litigation should they have been executed by the defendant without the knowledge and approval of the parties in litigation or of the competent judicial authority.

"5. Any other contracts specially determined by law."

Commenting on § 1291 of the Spanish Civil Code, identical to § 1243 of our Code, Manresa states:

"I. *Cases of rescission enumerated by law.*—The enumeration the law makes of contracts which may be rescinded, has the following scope : It does not confine rescission to the first four cases enumerated therein, since in the fifth clause it fully covers any other contract specifically provided for in any other legal provision; but it serves the purpose of indicating that in the absence of such provision permitting it, the action for resolution, which is exceptional, not an ordinary action, cannot be resorted to even alleging damages on any other grounds." (8 Monresa, *Comentarios al Código Civil Español*, p. 730.)

Evidently the present case does not fall within the purview of the first four paragraphs of said § 1243. Therefore, we must determine whether the contract executed between the Municipality of Ponce and the defendants falls in paragraph 5, that is, among those contracts which, by special provision of law, may be rescinded.

■■ Among the cases referred to in paragraph 5, wherein the rescissory action lies by special provision of law, there are certain Sections relating to the contract of purchase and sale—which, of course, are not applicable to the present case —and § 1077 of the Civil Code, which provides for the rescission of reciprocal obligations, in case one of the obligated persons does not comply with what is incumbent upon him.

Let us examine, therefore, § 1077 of the Civil Code:

"Section 1077.—The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him.

"The person prejudiced may choose between exacting the fulfilment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfilment, should the latter appear impossible.

"The court shall order the rescission demanded, unless there are sufficient causes authorizing it to fix a period.

"This is understood without prejudice to the rights of third acquirers, in accordance with sections 1247 and 1250, and with the provisions of the mortgage law."

The breach of a contractual obligation not always gives rise to the resolutory[3] action provided by § 1077 of the Civil Code. In order for this action to exist the nonfulfilled obligation must be of a reciprocal character. For this reason in order to determine whether the nonfulfilled obligation on the part of the defendant gives rise to the rescission of the contract we must first fix the concept of reciprocal obligations.

In bilateral contracts there are obligations and correlative obligations so interdependent between themselves that one is a consequence of the other, and the performance of said obligation by a contracting party constitutes the motive of the contract for the other party, and viceversa. Thus we see that in a contract of sale the obligation of the vendor to deliver the thing sold is the motive of the contract for the purchaser, and likewise the correlative obligation of the purchaser to deliver the value is the motive of the contract for the vendor. Such are the reciprocal obligations contemplated by § 1077 of the Civil Code.

There are also other obligations which are incorporated in contracts for the sole purpose of supplementing and clarifying the stipulations of the contracting parties, and which do not constitute the real motive for the contract and are known as accessory or complementary obligations. In a contract of sale, for example, there is, among others, the obligation of the vendor to be liable for the eviction and warranty and of the purchaser to pay the value of the thing sold at the time and place fixed by the contract. The breach of these accessory or complementary obligations shall give rise to an action for damages or to any other action justified

---

[3] Textwriters, cases, and some codes use indistinctly the terms "resolutory" and "rescissory," and although, in so far as § 1077 of the Civil Code is concerned, the correct denomination of the action is resolutory, the use of either term is of no consequence.

under the special circumstances of each case, but never to the resolutory action regulated by § 1077 of the Civil Code, which is reserved exclusively for the breach of reciprocal obligations.

Don José Castán, in his modern work *"Derecho Civil Español Común y Foral,"* rev. 6th ed. (1943), vol. 2, p. 482, explaining the meaning of reciprocal obligations, says:

"Said Sec. 1124 is of great importance for its every day application and it has given rise to abundant decisions of the Supreme Court. Among others, the following declarations are important:

"   *           *           *           *           *           *           *

"(2) That in order for Sec. 1124 to be applicable it is required: (a) The obligations involved must be clearly of a reciprocal character, for said Section may not be applied to obligations which although incorporated in a unilateral or bilateral contract, have a mere accessory or complementary character in regard to those promises or correlative promises which constitute in that case the principal object of the contract."

Mr. Castán invokes in support of his theory the decisions of October 24, 1899 (88 *J. C.* 171), February 14 (123 *J. C.* 490) and September 29, 1912, March 13, 1930 (193 *J. C.* 251), January 5, 1935 (217 *J. C.* 36), and October 24, 1941.

And Manresa explains it thus:

". . . The fact that the obligations are bilateral or reciprocal presupposes that the two parties, necessary to the contractual relation, are at the same time debtor and creditor to each other. But this is not enough; *this feature of these obligations means something more: a reciprocity so complete that it makes both relations arise from an only cause, each obligation being also a condition to the other one, and, in brief, one cannot be conceived without the other* . . . Furthermore: if the loan of a specific thing is made, the borrower must pay, and the lender may have the duty of repaying the former, for any expenses arising from the object loaned, and yet, in those obligations the quality of reciprocity in its true sense is nowhere present; because if we distinguish well between them, it can be seen that they do not strictly have their origin in the same, *identical* cause, and, above all, *that they do not arise at the same time, as being both of them necessary, and mutually the foundation for the other.* On the

other hand, we do fully appraise that quality of reciprocity by comparing, in a contract of sale, the obligations of purchaser and vendor to respectively deliver to each other the price and the object; or in a lease, those of landlord and tenant, to give the one the use of the leased premises, and the other to pay the agreed rental, etc.; and this is so because in all these cases we cannot imagine how one obligation can exist without the other unless we change their nature." (8 Manresa, *Comentarios al Código Civil Español*, p. 148.) (Italics ours.)

But the meaning of reciprocal obligations is best illustrated by the decision of January 5, 1935, of the Supreme Court of Spain, 217 *Jurisprudencia Civil*, p. 36. The facts of the case may be summarized thus:

Doña Antonia Pellicer had delivered to the Banco de Reus de Descuentos y Préstamos, which we shall hereafter refer to as Banco de Reus, certain drafts which were due and had not been paid. In order to prevent the bank from collecting those drafts through judicial proceedings, doña Antonia Pellicer and the Banco de Reus executed a contract by virtue of which the bank bound itself not to sue on said drafts for a period of five years, and in consideration of this waiver doña Antonia Pellicer bound herself to pay to the bank up to the amount of 150,000 *pesetas* by reason of any loss or damage which it might sustain as a consequence of this postponement, if within those five years she could not pay to the bank the amount due. In order to secure the performance of this obligation, doña Antonia Pellicer bound herself to deposit in the Banco de Reus in cash and without interest the amount of 150,000 *pesetas*, which she could not draw until after the expiration of five years, the bank being authorized to take possession of the whole or part of said 150,000 *pesetas* as compensation for the losses suffered on that account. It was stated in the contract that considering he sacrifice which said guaranty meant to Mrs. Pellicer, inasmuch as she had to borrow from the Banco de Cataluña the 150,000 *pesetas* at an annual interest of 5 per cent, the Banco de Reus bound itself

exclusively to pay to the Banco de Cataluña the interest on the 150,000 *pesetas* loaned to Mrs. Pellicer, the latter being entirely exempted from said payment. The Banco de Cataluña, however, was not a party to the contract exectued between the Banco de Reus and Mrs. Pellicer, and never released Mrs. Pellicer of the obligation to pay said interest in case the Banco de Reus should fail to do so. After the latter had paid several interest instalments, Mrs. Pellicer learned that the Banco de Reus had failed to continue the payment of interest and instituted this action for the rescission of the contract executed with the Banco de Reus alleging that the defendant had not fulfilled its reciprocal obligation by failing to pay the interest to the Banco de Cataluña and prayed that, after declaring the contract rescinded, the amount of 150,000 *pesetas* which she had deposited in the bank be delivered to her. The Court of First Instance of Reus sustained the complaint and, failing to grasp the correct concept of reciprocal obligations, held:

"No Section of the Civil Code justifies the sense of correlation which defendant tries to apply to mutual obligations; it merely has the grammatical sense of reciprocity, that is, that each one of the contracting parties should have certain obligations to perform or not for the other or towards each other, it being sufficient to convince ourselves to consider first, that in obligations arising frm contracts of lease or of purchase and sale, for example, there are many obligations such as those to make repairs, keep the purchaser or the lessee in possession, advise of any usurpation, not to change the form, be liable for eviction and warranty, etc., all of which are reciprocal although they are not correlative, as well as those of delivering the thing or the price; and second, that such a theory would lead to the absurd conclusion that a contracting partiy may fail to fulfill all those obligations which should not be correlative to those of the other party, and yet the latter could not demand the rescission of his own obligations."

The bank appealed to the Audiencia of Barcelona and that court reversed the judgment of the Court of First Instance of Reus. Then Mrs. Pellicer appealed to the Supreme Court

of Madrid and the latter affirmed the judgment of the Audiencia of Barcelona and, among other things, held:

"First. That the aforesaid agreement clearly arose from two reciprocal obligations to wit, that of the Banco de Reus not to bring any action for collection of certain drafts against doña Antonia Pellicer et al., and that of Doña Antonia Pellicer to pay to said bank for any damage and loss which it might sustain by reason of the aforesaid drafts up to the amount of 150,000 *pesetas* if within the period of five years the whole amount were not paid to the bank; this last obligation being secured by a deposit in cash and without interest for that amount.

"Second. That under said agreement another obligation was contracted by the Banco de Reus, it being stated therein that considering the sacrifice which said security in favor of Banco de Reus de Descuentos y Préstamos meant to Doña Antonia, inasmuch as in order to obtain the 150,000 *pesetas* she had to borrow that sum from the Banco de Cataluña, with interest thereon at the rate of 5 per cent per annum, the Banco de Reus bound itself exclusively to pay to said Banco de Cataluña the interest on the 150,000 *pesetas* loaned to the aforesaid Doña Antonia Pellicer, the latter being fully exempt from said payment . . . . .

" *        *        *        *        *        *        *

"Before it can be said that bilateral or reciprocal obligations are involved, it is necessary not only that there should exist, in the same contract, obligations from both parties but also that the obligation of one party should be correlative to that of the other, and, therefore, that there should exist a mutual undertaking, producing necessarily the following twofold result:

"First: That, as we have already held, in order for Section 1124, of the Civil Code to be applicable, the condition of reciprocity must be so well established that one obligation can not be conceived without the other. (Decisions of March 14, 1913, and October 30, 1917.)

"Second. *That said Section may not be applied to obligations which, even though incorporated in a unilateral or bilateral contract, have a mere accessory or complementary character in regard to those promises and correlative promises, which constitute the main object of the contract.*" (217 *Jurisprudencia Civil*, pp. 45 ,46.) (Italics ours.)

Applying to the case at bar the principles above set forth, we must conclude that the reciprocal obligations in the pre-

sent case are: on the part of the defendants, the constitution of a servitude, and on the part of the plaintiff, the concession of 18,000 gallons of water each 24 hours; and that the obligation of the defendants not to use the water for purposes other than those stipulated, is an accessory or complementary obligation. Therefore, assuming that it was violated by the defendants, said obligation, not being of a reciprocal character, does not give rise to the rescission of the contract. As we have previously pointed out, this does not mean that in cases like the present, wherein the evidence tends to show that the defendants violated the accessory obligation of not using the water for irrigation purposes, the plaintiff lacks all remedy to obtain redress. The plaintiff, by means of an action for damages for breach of said obligation, could have obtained relief for the water unlawfully used by the defendants, and by a writ of injunction it could have prevented the repetition of the unlawful act, all this without prejudice to the criminal action which could be brought for the misappropriation of the water.

But the judge of the lower court, instead of sustaining the demurrer for insufficiency of facts to constitute a cause of action, overruled it and, passing on the merits of the case, found that the contract executed between the plaintiffs and the defendants was void because it was contrary to public policy. It should be noted that no allegation is made in the complaint with respect to the supposed nullity of the contract, nor is this remedy sought, the plaintiff confining itself to praying for the rescission of the contract, although in a peculiar way, for it prays that the defendants be deprived of the water to which they are entitled under the contract, while the plaintiff is to continue enjoying its benefits. Nor did the defendants seek that the contract be declared void, confining their prayer to the dismissal of the complaint. The judge confused the rescissory or resolutory action with the action for nullity. Although it is true that in both actions the period of prescription is four years, and that upon decreeing the res-

cission or the nullity the contracting parties are bound to return to each other the things which were the subject matter of the contract with their fruits and the price with interest thereon, thus reestablishing he *status quo* existing at the time the contract was entered into, it is a fact that they are two distinct actions. To this effect Falcón says:

"Our Code takes pains not to confuse rescission with nullity like some foreign Codes do, as in fact rescission and nullity are not the same thing in law, although sometimes their effects are confused.

"Rescission invalidates a validly executed contract, and it annuls it by virtue of a just cause discovered subsequent to its execution. Nullity is a declaration that the contract never existed because in the execution thereof one of the essential requisites was lacking. Both rescission and nullity set aside a contract; but rescission does so for equitable reasons which do not really affect its validity. Nullity does so for reasons which affect its very existence. Therefore, the causes for rescission and those for nullity are, and must be, different; and this is the reason why the Code treats them separately, as it should." (4 Falcón, Civil Code, 122, 123.)

These two actions being different, and there not existing in the pleadings nor in the evidence any ground on which the nullity of the contract could be based, the trial judge erred in rendering the judgment appealed from. *Crespo v. Crespo, ante,* p. 321.

For the reasons stated the judgment of the lower court must be reversed and another rendered instead dismissing the complaint, with costs against the plaintiff.